Good afternoon, your honors. May it please the court. My name is James Kemp. I represent the appellant Jorge Rosales in this matter. I'd like to reserve three minutes for rebuttal, please. In this case, the district court found that Bellagio failed to engage in the interactive process in good faith. That's in the excerpts of record volume one, page seven. At that same page, the district court found that Mr. Rosales had produced sufficient evidence to establish a crime of facial case of discrimination, including that there was potentially a reasonable accommodation that would have permitted to continue to perform his job as a room service server at the Bellagio Hotel. That should really be the end of it for summary judgment purposes. Under Barnett v. US Air, this court has held that if there is any genuine dispute as to an employer having good faith and having engaged in good faith in the interactive process, that it cannot prevail at summary judgment. Here, the district court found specifically that the employer had not engaged in the interactive process in good faith. Therefore, under Barnett, the granting of summary judgment was an error and should be reversed in this case. Mr. Rosales, he expressed a desire to continue working as a room service server. He told the employer that he believed he could do it. And when he said that he could do that work, he meant the regular work, which he refers to as the light work. That's the regular work of taking room service orders from the kitchen to the hotel rooms of guests. And he distinguishes that from the heavy work. And heavy work he refers to is hospitality work where there are larger parties and a lot more guests involved and therefore heavier items. That work, he says, is generally not a central function because it is optional. If an employee, a room service server, does not want to do that kind of work, they're allowed to decline it. And the only penalty for that is that they're put to the bottom of the list. Generally, those larger parties, and you can imagine larger parties with more guests, often results in more tips and more income. So the penalty of putting somebody at the bottom of the list means that they won't get another chance to do that work. Counsel, is pouring a glass of milk considered part of the light duties? Pouring a glass of milk would probably be a part of the regular service. When he takes an order to the room, he maybe will have to pour a glass of milk and put that on the tray, which then would go on a table. But didn't he admit that he could not pour a gallon of milk, that that would hurt him? At one point, he said that after his surgery that would, but I believe by the time of his deposition, he said that he would be able to do a gallon of milk. And according to his doctor, his doctor's restrictions said that he could lift up to 36 pounds and carry up to 36 pounds. The job description that we have at Excerpts of Record Volume 2, page 109, shows that the maximum lifting and carrying for the job on the job description is 35 pounds. So in accordance with his doctor's restrictions, he was capable of doing the essential functions of the job with respect to the lifting and the carrying that's involved with that. During his meeting with Ms. Murtaugh, didn't he say that he couldn't quite do everything that a doctor said he could do? I think that that's in dispute. I think that Mr. Rosales contended that he could do the regular room service job. The only thing that he felt that he couldn't do was the heavy work, which would be doing the hospitality, the larger groups, which would be more physically intense and require some heavier lifting. But I will note, again, that the job description doesn't note that those are essential functions because the heavier weights that would have to be lifted are not listed as requirements on the job description. So again, that would be – that heavy work is more in the nature of being marginal functions because it is not something that he had to do. It's not something that he did day in, day out. It was something that would come up every couple of weeks, and he was able to decline that work if he wanted to. So he could do all of the essential functions of the regular room service job, the marginal functions maybe not so much. And there was some testimony, too, that if there were heavier trays that were going up to the rooms, that he might need the accommodation of rather than carrying those as a waiter would by hand, that he would be able to use a rolling table to be able to do that. So that was another accommodation that was possible. The district court judge indicated that the testimony of Ms. Galazade, who is the director of in-room dining, said that the lifting requirements were between 30 and 40 pounds. Mr. Rosales' doctor said he could do 36. And so if there were some items that were slightly above that, they should have had the interactive process to determine what those were. I was just looking at the SER-17, and he seemed to say that if he lifts one gallon of milk too much, I can hurt myself. Too much. So that's talking about a frequency. But then we have to know from the employer what is the frequency that he might have to do that. And that's the blue hearted milk? Counsel, this is Judge Schroeder. I want to make sure I understand the nature of this job. Leaving aside what you call the heavy work, which is putting together these tables and carrying all these things, which is how he hurt himself originally, I guess. But putting that aside for a moment, if I understand it, the deliverer has to get the stuff loaded from the shelves or whatever it is onto the cart. And then get the cart to the room. And then lift the case that the meals are in off the cart and onto wherever it is in the room that it's going to go. Is that right? I believe that you can empty out the, I think they call it a hot box. And my understanding is you can empty that out to serve it. The hot box itself, they said, would weigh about 35 pounds. So he can't lift the hot box itself. He'd have to take each thing out separately. Is that what you're saying? And then he can't lift up onto the shelf to load the cart is what I understood. So is that right? Well, what his doctor's restriction said is that he should avoid, not absolutely not do, but avoid lifting, reaching overhead with his right hand. So he would be able to do that with his left hand. And again, it's not an absolute proscription. It's just that he's to avoid that repetitively. And so the testimony, again, from Ms. Galazade, who is the director, said that he would be able to lift things off the shelves with his left hand, not using his right hand as much. So that's my understanding with respect to taking things off of the shelf, is that he could do it with his left hand, and he could use his right hand, just not repetitively over and over again. And that's one of the problems with the interactive process here. The employer, rather than just saying you can't do this job, should have worked with him and possibly reached out to the doctor as part of the interactive process to determine what exactly the doctor had in mind when he said repetitively. Is that, you know, the same movement over and over again for hours on end, or does he mean not more than 20 times in a day? We don't know that. And if they've engaged in the interactive process, that could have been uncovered. And that, I think, is part of the reason the district court did find that Bellagio failed to engage in the interactive process in good faith, because they came to the meeting, the first meeting on March 28, 2016, with Mr. Rosales, having already made up their mind that they were not going to let him continue to work in his job. They were not going to try and accommodate him. They were going to push him into a job search program where he would basically have to go out and apply competitively for other jobs, not only at Bellagio, but throughout the MGM properties. So I hope I've answered your questions, Judge Schroeder. What was the decision that he took to his employer as to his ability to do the job? He contended that he could do his job, just not those marginal tasks that he refers to as the heavy work, which was the hospitality work, where there was apparently more heavy lifting and setting up the large tables, which realistically, I think, should have taken two people to do anyway, because they were large tables. But again, that was considered to be marginal and something that he could decline to do, with the only penalty being that he got put to the bottom of the list for those big parties. Do you consider that an accommodation? It seemed to be a little unclear whether or not you're arguing that he doesn't need an accommodation or that that's not part of his job. So the heavy duty is not part of the job, so therefore, it's not an accommodation. Well, he does need an accommodation with some of the lifting and carrying of trays. And that was spoken with Ms. Galazade that he might need a table to push those larger trays. Again, that would be as part of the regular room service, going to hotel rooms and not the larger hospitality types of orders. With the hospitality orders, it's a marginal function. I believe that it would be an accommodation that he would need to make sure that he was able to decline those without there being any problems, which it appears that there could be. And again, the statute, 42 U.S.C. section 1211 subsection 8, and the regulation 29 CFR 1630.2 sub M, it talks about you have to be able to do the job with or without an accommodation. So Mr. Rosales was considered to be disabled by the employer, and they terminated him because of his disability. They took him off of his room service server job expressly because of his disability. They claimed that he couldn't do it. Because he couldn't do the job. What's that? It was because he couldn't do the job. That was their contention, but he contended that he could, and they didn't go through the interactive process in good faith to determine whether or not accommodations would permit him to go on doing his job. And that's where we come back to the holding in Barnett that says if someone, if an employer does not engage in good faith in that interactive process to make these determinations, summary judgment is inappropriate because good faith is a question of fact, fundamentally a question of fact. Could Bellagio's attempt to put him in a job placement program be considered part of the interactive process, the good faith interactive process? So the job placement program, one accommodation under the ADA would be job reassignment. But job reassignment, frankly, what's contemplated by the EEOC regulations or the EEOC guidance and what Bellagio does, Bellagio has people, they just give them lists of jobs. It doesn't provide the essential functions. It doesn't provide all of the physical requirements, and it says you can go out and apply for those jobs. Well, anybody, any of us on this video screen could go and apply for the jobs. What the EEOC says has to happen is you have to put somebody in a job that's open and available and that the person's able to do. And the employer is in the best position to know what those jobs are and what the requirements of the jobs are. So Bellagio's job placement program, I don't think, complies with what the EEOC requires for an accommodation. This is a very confusing case to me because the positions seem to be changing. Was the district court correct when it said that Rosales told the HR person that he could return to work if his duties were restricted to light orders like coffee orders, amenities, regular orders that didn't involve too much effort? Yeah, so he talks about regular orders, the regular room service orders that are going up to the- He's not talking about lifting trays full of big plates. Correct. Full meals. Lifting full trays like that could have been an issue that he would have needed an accommodation for, which they talk about using the cart, that that would have been available as a reasonable accommodation. And I think that's consistent with what the district court said. Well, 30 to 40 pounds, so his rating is 36 pounds. I mean, so there could be some accommodations for those other items. Maybe there was other equipment that could be used or something of that nature. But, again, we never had a reasonable individualized interactive process in this case that took place in good faith to make those determinations. The employer came to the meeting saying, we're not going to let you do this job. And that's the problem. And, Your Honor, there are clearly questions of fact that preclude summary judgment. And I ask that you rehearse, and I'll try and keep the rest of my time. Thank you. Thank you, counsel. Thank you. May I proceed? Thank you, Your Honor. May it please the court, Devery Christensen for Bellagio LLC, the appellee defendant in this case. I'd like to address a few points that Your Honors have been inquiring about. The good faith dialogue and the work that the individual could not perform, aside from those large hospitalities for which he could refuse to do the work. There was other work, including side work, which is a primary function of the job and an essential function that he could not do. He specifically called out the difference between heavy and light side work. If you look at the supplemental excerpts of record on pages of his deposition, it goes from page 26 to 27 of the supplemental excerpts. He clarifies that the heavy work that he didn't think he could do was unsticking tables. So, as part of the side work of this job, all of them have to help continuously stock and clean the area where they then prepare the food service on the individual tables that are then rolled up to the guest room. In order to do that, they have to constantly clean and stock the area where they pull the plates, the glassware, the service items, the condiments, anything that goes onto the table that goes up to a guest room. They retrieve those items from big storage areas in the back, whether it's refrigerated or not refrigerated. They have to climb potentially up to a 10-foot high shelf to lift down boxes of condiments and other items and then take those over to the area where I'll call it the staging area where they put together the individual service tables. They then have to lift those up either to a 5-foot height or even higher to the top shelf where they then have to dump the entire box of product into the bins that hold the condiments and other items. One of the things that he said clearly could not do was folding and unfolding the tables that they perform all of this work on where they take the table up to the guest room. That's on page 26. He never said that the tables themselves had to be folded and unfolded by two to three people. What he said is sometimes the room service tables got stuck, and when they got stuck, it would take two or three of them working together to unstick stacks of tables. But the tables themselves had to be put together by each individual server. What's important is on supplemental excerpts of record page 27, after he explains the tables, he goes on starting at line 7 to state, So that part of the side work, I don't think I could do anymore. But most, there was a listing of side work that was light work, too, like cleaning the beverage area. I would just be cleaning, cleaning the beverage area, nothing to do with heavy lifting. He's clearly saying that there was side work that was light, side work that was heavy, and he couldn't do heavy side work. He only wanted to do the light work. This restriction is not solely about lifting, though. He had a restriction that clearly says from the doctor, no avoidance of repetitive movements of the neck and avoidance of repetitive reaching overhead on the right side. He talks extensively about his neck movements. On supplemental excerpts of the record on pages 19 to 20, he talks about the neck movement. He explains, I had to constantly move my neck. Look here, look there, look up, look down, because to set the table for each guest's order, he would look up to the dishes, grab the dishes he needed, put them down on the table. Look up to the glassware, put it down on the table. Look up to whatever condiments he needed, put it down on the table. He said he also had to look to the kitchen and look to his hot box. The hot box, empty, weighs 36 pounds. That hot box is lifted into the table, placed, and the food is set inside it. Then it goes up to the guest room. It's unloaded. Then the hot box itself is removed and taken back down to the kitchen for the next room service order. In addition to that, he specifically said in his deposition testimony that the side works had hurt his arm. That was on supplemental excerpts 27. Beyond that, with respect to his neck, he said on supplemental excerpts page 24, starting at line 24 on to page 25, that even doing light work would not help with his neck restriction and neck pain. Because of the amount of neck movement that's worked. Respectfully, this is a very physical job. These servers are constantly moving from the time they come on shift to the time they go off shift. If they are not placing items onto the table to take up to an individual guest hotel room, they are bringing it back down. They are then doing whatever their assigned station is for the day, part of the side work, to restock and clean everything. The supervisor in this case testified about the side work and that it is shared by all of the food servers. They rotate around so that all of them share in what might be considered light versus what might be considered heavy. That is on excerpts of record 247, 227, and also on page 232, they also share in all of the cleaning responsibilities. None of the servers are allowed to only take light orders or do only light side work. If you look at the job description, which is excerpts of record page 106 to 109, on page 106, it specifically states, the very first two sentences, what the essential primary function of this job is. It's the primary responsibility of the food server, room service, to take and deliver customer orders, maintain tables, guest satisfaction, and finalize checks. The food server is also responsible for side work and general cleaning of the assigned station. The assigned station is rotated throughout the days for all of the room service servers. So there were a number of places where he said that there were things that are part of his essential job functions that he could not perform them. Part of the interactive dialogue, he claims that there was not a dialogue. That's a misstatement of the record. And respectfully, we disagree with the district court's finding that there was not a sufficient dialogue. If you look at excerpts of record page 129, those are developed. Wait, what do we do with that finding? Yeah.  So respectfully, it's not the court's fault. Either there's a genuine issue of fact, or if we accept that conclusion, that has some significance in this case. Yes, Your Honor. I agree. It's difficult because all throughout this case, and if you look at the complaint, there's a single cause of action for disability discrimination, and it's clearly articulated as a failure to accommodate. But when we filed our motion for summary judgment on the failure to accommodate claim and identified that he was unable to perform the essential functions for the reasons that we've been discussing, 24 times in his opposition, plaintiff took the position that he did not need accommodation. That is counter to what he represented in his complaint and answers to interrogatories he gave us where he specifically said he needed modified light duty work in order to continue performing the job. So if he claims now that he needs no accommodation, it can't be a failure to accommodate case. It's axiomatic that the individual has to ask for an accommodation or there has to be one available that they need in order to perform the job that is then denied by the employer for them to claim a failure to accommodate. So if this is no longer a failure to accommodate case, then it's analyzed under the disparate treatment standard under McDonnell Douglas. Now, why the court didn't give us a transition sentence saying now that plaintiff is denying he needs accommodation, I'm going to analyze this under disparate treatment, that appears to be what the district court in fact did. Very puzzling what the district court did. I mean, if you take it at face value, he applied the wrong standard. And, you know, that leaves us with either revising the record or doing our own analysis, which is not summary judgment material. And so, Your Honor, you do have the authority to affirm a decision based on any evidence in the record and you do review it de novo. So you have the evidence in front of you. If this court were to de novo review whether or not this is a failure to accommodate case and whether or not the individual could perform the essential job functions based on the medical evidence, which is not on its face contradictory or confusing and the admissions made by the plaintiff. Yes, it would seem pretty plain that the plaintiff always thought it was a failure to accommodate case. And I recognize and I accept your point that there have been some different representations made to the district court at last. But it seems to me right now and I'll ask your opponent. It's a failure. It seems to be a failure to accommodate case, regardless of the fact that the positions have shifted.  Yes, Your Honor. If this is assessed as a failure to accommodate case, then the court did not apply the standard to look at whether this is a qualified individual who is able to perform the accommodations or able to perform all the essential functions with or without accommodations. The important thing here is, did he ask for or need a reasonable accommodation? The only accommodations he asked for was a permanent modified light duty job, removing from him any of the heavy activities. Now, that's not just those hospitalities. That's also the side work that he said he couldn't do. The other would be to have his co-workers do the work. And he testified there was always lots of other service around. They could just do those functions for me. What he is asking for as a matter of law is to require the Bellagio to create a permanently modified duty position for him where we limit him to light work and take away part of his essential functions and to require co-workers to perform the heavier parts of the job for him. That's not required by the law. That's not a reasonable accommodation. Judge Thomas just, I think, indicated that this was always a reasonable accommodation case. I thought that the situation in the record at the time that was before the district court was that he had said that he couldn't do the essential functions of the job. No, actually he stated he could perform all of the essential functions and no longer needed accommodation because hospitalities were optional. And setting aside the hospitalities... At that point he said that there was no accommodation needed because he could do the job except for this heavy stuff. Well, he called the hospitalities heavy. There were other heavy parts of the job he didn't acknowledge that we still maintain he could not perform. You pointed to the record about the essential functions, but I'm not seeing a lot of what you're saying is an essential function that's listed on the job description. Am I missing something? The job description doesn't have a heading saying essential functions. I was reading the very first two sentences in the body under job description and function where it says what the primary responsibility is. And the statute states that if an employer has an existing job description, that that is evidence that will be taken by the court in considering what the employer has determined are essential functions. And I don't think there's any dispute that the primary and essential function of this job is to provide room service to customers. And in order to do that, they have to do all the side work that allows them then to set the tables and take all of the items up to the guests. That's the primary function. That's the essential function of the job. We're not arguing over those hospitality events. We're arguing over whether he can do the basic day-to-day service of the customer and side work that's required of all of the servers. I think the other important point to remember is about the good faith dialogue. There was argument that there was not a good faith dialogue and that a predetermined decision had already been made, but that leaves out testimony in the record. I would ask the court to review excerpts of record page 186 and excerpts of record page 204. Both of those state that the HR person did look into whether he could perform the essential functions and talk to management and observe employees doing that job. Then she met with the plaintiff, at which point they discussed his restrictions and what he thought he could not perform. That's excerpts of record page 129. I know it's a little bit difficult to read the writing, but because, of course, this individual was deposed, she was able to tell us what her writing said. It started out by talking about his permanent restrictions, and then it went to him, asking him his response. He said, couldn't keep head up, feel we lift more than 35 pounds, push-pull carts that weigh over 150 pounds, pushing up the hill. There's a very long hill on the interior side of Bellagio that's not seen by the public. That's what he's referring to. Feel we lift over 50 pounds with large parties. Not always have help. Have heavy hot boxes. Don't want to hurt self with lifting. Was unable to turn head before surgery. Still pain. No more surgeries. Back still hurt. These were the items that he reported to human resources. Excerpts of record 204. Counsel, what do you make of the district court's determination that because HR personnel determined that he had no reasonable accommodation before meeting with him, that that was in itself not a good faith interactive process? Respectfully, I think it's an incomplete determination because there is testimony in the record on the pages I've cited where she says specifically after meeting with the plaintiff, she went back to management and talked about the challenges that he had identified with performing the job and did look into accommodation. She said in that meeting with him, she was simultaneously dialoguing over whether they could accommodate him in his job or whether they could find him a new job to transfer him to. And that is also part of an accommodation process required by the ADA when a person cannot remain in their job. So they were doing that simultaneously, and that is also in her testimony. Counselor, your time was expired, but I want to make sure everybody's had their all the judges have asked the questions they want to ask. Any further questions? Thank you, Your Honors. Rebuttal. We'll put two minutes on the clock. Thank you, Your Honor. Yes, I mean, the job description speaks for itself. It only requires the 35-pound lifting maximum. And Mr. Rosales' doctor said that he could do 36. To the extent that Ms. Harbaugh is saying things in her deposition testimony or in notes that she made or in a declaration later, that's all in dispute. These are disputed facts because Mr. Rosales contends that he could do his job. He might have needed slight accommodations, like we said, lifting the heavy trays in traditional waiter style. He couldn't do it. He might need to put it on a table and roll it. Ms. Golizade's testimony was that HR came to her and said, is there anything besides what's in the job description? She told them no. What's in the job description is pretty much what we do. You know, in workplaces all the time, people work as a team. This side work was assigned by management on a case-by-case basis, and they could have worked as a team and worked this out. That happens all the time in workplaces. They came to this meeting with Mr. Rosales and did not engage in good faith. If they had questions about what repetitive was meant by the doctor, they should have asked him that. They should have gotten clarification from the doctor. They didn't do that. So there was a lack of good faith. And as we said, Barnett says if you come and do this interactive process in bad faith, then there's a question of fact. If you're not acting in good faith, there's a question of fact that will preclude summary judgment, and that's exactly what we have in this case. The district court sought a reasonable jury and could certainly see it as well, and therefore summary judgment was inappropriate and asked the court to reverse summary judgment and send this case back for trial.  Any further questions? All right. The case has already been submitted for decision. Thank you both for your arguments and for accommodating us in terms of the video presence. I think you did very well in presenting the case. Thank you. Thank you.
judges: Thomas, Schroeder, Bumatay